UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

JOSEPH HOFFMAN,

        Plaintiff,        Case No. 2:10-cv-269

v.        Honorable Robert Holmes Bell

LYLE RUTTER, et al.,

        Defendants.
_____/

**REPORT AND RECOMMENDATION**

This is a civil rights action brought by a state prisoner pursuant to 42 U.S.C. § 1983. On October 14, 2010, this Court ordered service of Plaintiff's complaint on Defendants Lyle Rutter, Dennis Straub, Jeri-Ann Sherry, Catherine Bauman, Jeffrey Contreras, and Dale Kurth. On February 24, 2011, Defendants filed a motion for summary judgment (docket # 18). Plaintiff filed a response (docket # 40) on May 26, 2011. Upon review, I recommend that Defendants' motion for summary judgment be granted.

Summary judgment is appropriate when the record reveals that there is no genuine issue as to any material fact in dispute and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *Kocak v. Comty. Health Partners of Ohio, Inc.*, 400 F.3d 466, 468 (6th Cir. 2005); *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005). The standard for determining whether summary judgment is appropriate is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *State Farm Fire & Cas. Co. v. McGowan*, 421 F.3d 433, 436 (6th Cir. 2005)

(quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)); *see also Tucker v. Union of Needletrades Indus. & Textile Employees*, 407 F.3d 784, 787 (6th Cir. 2005). The court must consider all pleadings, depositions, affidavits, and admissions on file, and draw all justifiable inferences in favor of the party opposing the motion. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Twin City Fire Ins. Co. v. Adkins*, 400 F.3d 293, 296 (6th Cir. 2005).

A prisoner's failure to exhaust his administrative remedies is an affirmative defense, which Defendants have the burden to plead and prove. *Jones v. Bock*, 127 S. Ct. 910, 919-21 (2007). A moving party without the burden of proof need show only that the opponent cannot sustain his burden at trial. *See Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 787 (6th Cir. 2000); *see also Minadeo v. ICI Paints*, 398 F.3d 751, 761 (6th Cir. 2005). A moving party with the burden of proof faces a "substantially higher hurdle." *Arnett v. Myers*, 281 F.3d 552, 561 (6th Cir. 2002); *Cockrel v. Shelby County Sch. Dist.*, 270 F.3d 1036, 1056 (6th Cir. 2001). "Where the moving party has the burden -- the plaintiff on a claim for relief or the defendant on an affirmative defense -- his showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986) (quoting W. SCHWARZER, *Summary Judgment Under the Federal Rules: Defining Genuine Issues of Material Fact*, 99 F.R.D. 465, 487-88 (1984)). The United States Court of Appeals for the Sixth Circuit repeatedly has emphasized that the party with the burden of proof "must show the record contains evidence satisfying the burden of persuasion and that the evidence is so powerful that no reasonable jury would be free to disbelieve it." *Arnett*, 281 F.3d at 561 (quoting 11 JAMES WILLIAM MOORE, ET AL., MOORE'S FEDERAL PRACTICE § 56.13[1], at 56-138 (3d ed. 2000); *Cockrel*, 270 F.2d at 1056 (same). Accordingly, summary judgment in favor of the party with the burden of persuasion "is

inappropriate when the evidence is susceptible of different interpretations or inferences by the trier of fact." *Hunt v. Cromartie*, 526 U.S. 541, 553 (1999).

Plaintiff is presently incarcerated at the Baraga Maximum Correctional Facility (AMF). Plaintiff asserts that while he was imprisoned at the Alger Maximum Correctional Facility (LMF), his First and Fourteenth Amendment rights were violated. Plaintiff contends his right to free speech was violated when he was barred from communicating with the news media. Plaintiff also claims that he suffered retaliation from Defendants when he attempted to exercise these rights. Plaintiff complains that he was denied removal from administrative segregation because of a magazine article that appeared in *Esquire* magazine about a prison escape Plaintiff had previously attempted. Plaintiff also complains that he was fired from his prison porter position in retaliation for the article.

Initially, Defendants claim that they are entitled to summary judgment because Plaintiff failed to exhaust his available administrative remedies. Pursuant to the applicable portion of the Prison Litigation Reform Act (PRLA), 42 U.S.C. § 1997e(a), a prisoner bringing an action with respect to prison conditions under 42 U.S.C. § 1983 must exhaust his available administrative remedies. *See Porter v. Nussle*, 534 U.S. 516, 532 (2002); *Booth v. Churner*, 532 U.S. 731, 733 (2001). A prisoner must first exhaust available administrative remedies, even if the prisoner may not be able to obtain the specific type of relief he seeks in the state administrative process. *See Porter*, 534 U.S. at 520; *Booth*, 532 U.S. at 741; *Knuckles El v. Toombs*, 215 F.3d 640, 642 (6th Cir. 2000); *Freeman v. Francis*, 196 F.3d 641, 643 (6th Cir. 1999). In order to properly exhaust administrative remedies, prisoners must complete the administrative review process in accordance with the deadlines and other applicable procedural rules. *Jones v. Bock*, 127 S. Ct. 910, 922-23 (2007); *Woodford v. Ngo*, 126 S. Ct. 2378, 2386 (2006). "Compliance with prison grievance

procedures, therefore, is all that is required by the PLRA to 'properly exhaust.'" *Jones*, 127 S. Ct. at 922-23.

MDOC Policy Directive 03.02.130 (effective July 9, 2007), sets forth the applicable grievance procedures for prisoners in MDOC custody at the time relevant to this complaint. Inmates must first attempt to resolve a problem orally within two business days of becoming aware of the grievable issue, unless prevented by circumstances beyond his or her control *Id.* at ¶ P. If oral resolution is unsuccessful, the inmate may proceed to Step I of the grievance process and submit a completed grievance form within five business days of the attempted oral resolution. *Id.* at ¶ P. The Policy Directive also provides the following directions for completing grievance forms: "The issues shall be stated briefly. Information provided shall be limited to the <u>facts</u> involving the issue being grieved (i.e., who, what, when, where, why, how). Dates, times, places and names of all those involved in the issue being grieved are to be included." *Id.* at ¶ R (emphasis in original). The inmate submits the grievance to a designated grievance coordinator, who assigns it to a respondent. *Id.* at ¶ X.

If the inmate is dissatisfied with the Step I response, or does not receive a timely response, he may appeal to Step II by obtaining an appeal form within ten business days of the response, or if no response was received, within ten days after the response was due. *Id.* at ¶¶ T, DD. The respondent at Step II is designated by the policy, *e.g.,* the regional health administrator for a medical care grievances. *Id.* at ¶ GG. If the inmate is still dissatisfied with the Step II response, or does not receive a timely Step II response, he may appeal to Step III. *Id.* at ¶ FF. The Step III form shall be sent within ten business days after receiving the Step II response, or if no Step II response was received, within ten business days after the date the Step II response was due. *Id.* at ¶ FF. The Grievance and Appeals Section is the respondent for Step III grievances on behalf of the MDOC

director. *Id.* at ¶ GG. Time limitations shall be adhered to by the inmate and staff at all steps of the grievance process. *Id.* at ¶ X. "The total grievance process from the point of filing a Step I grievance to providing a Step III response shall be completed within 90 calendar days unless an extension has been approved . . . ." *Id* at ¶ HH.

In order to properly exhaust Michigan Department of Corrections grievance procedures, a prisoner must raise each of his claims for the first time at Step I. *Burton v. Jones*, 321 F.3d 569, 574 (6th Cir. 2003). However, where a prisoner has set forth a claim in his Step I grievance, he may present additional factual detail at Steps II and III that clarify his allegations at Step I, as a means of justifying his appeal. *Id.* Raising allegations against a particular defendant for the first time at Step II or III is insufficient to demonstrate exhaustion. *Id.* at 576 n.4.

Defendants Straub, Sherry, and Bauman were not properly named in any grievances filed regarding any issue in Plaintiff's complaint. The grievance Plaintiff filed regarding the administrative segregation claim in his complaint did not name Defendant Bauman in the Step I grievance. Plaintiff failed to mention Defendants Straub or Sherry in his Step I grievance, as well as in his Step II and Step III grievance appeals. (Def. Ex. C, ¶¶ 9). Plaintiff later attempted to add Defendant Bauman in his Step II grievance appeal. However, as noted above, Plaintiff was required to name Defendant Bauman in his Step I grievance in order to demonstrate exhaustion. Because Defendant Bauman was not named at Step I, and because Defendants Straub or Sherry were not mentioned in any of the grievances, Plaintiff has failed to exhaust his available remedies.

In addition, Defendants claim that Plaintiff has failed to show the requisite personal involvement as to Defendants Straub, Sherry, and Bauman to establish liability. Plaintiff claims that he was placed in administrative segregation after a review by Defendants Straub, Sherry, and Bauman. However, at the time Plaintiff was placed in administrative segregation, Defendant

5

Bauman was not employed at Alger Correctional Facility. (Def. Ex. B, ¶¶ 4). Plaintiff claims that only Defendants Straub and Sherry may authorize Plaintiff's release from administrative segregation. Defendants note that a request to reclassify Plaintiff from administrative segregation was never submitted to Defendant Sherry or Defendant Straub for approval/disapproval. (Def Ex. C, ¶¶ 7). A party cannot be held liable under Section 1983 absent a showing that the party personally participated in, or otherwise authorized, approved or knowingly acquiesced in, the allegedly unconstitutional conduct. *See e.g. Leach v. Shelby Co. Sheriff*, 891 F.2d 1241, 1246 (6th Cir. 1989), *cert. denied*, 495 U.S. 932 (1990); *Hays v. Jefferson*, 668 F.2d 869, 874 (6th Cir.), *cert. denied*, 459 U.S. 833 (1982). *See also Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir.), *cert. denied* 469 U.S. 845 (1984).

Plaintiff has not alleged facts establishing that Defendants Straub, Sherry, and Bauman were personally involved in the activity which forms the basis of his claim. Defendants Straub, Sherry, and Bauman's only roles in this action involve the denial of administrative grievances or the failure to act. These Defendants cannot be liable for such conduct under § 1983. *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999), *cert. denied*, 530 U.S. 1264 (2000). Accordingly, the Court concludes that Plaintiff's claims against Defendants Straub, Sherry, and Bauman are properly dismissed for lack of personal involvement.

Furthermore, Defendants claim that Plaintiff does not state a proper retaliation claim. Defendants claim that Plaintiff's correspondence with *Esquire* was not conduct protected by the First Amendment. Defendants claim that even if Plaintiff's conduct was protected, Defendants have demonstrated that their decisions were based on reasons other than barring Plaintiff's exercise of a protected right. Retaliation based upon a prisoner's exercise of his or her constitutional rights violates the Constitution. *See Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc).

In order to set forth a First Amendment retaliation claim, a plaintiff must establish that: (1) he was engaged in protected conduct; (2) an adverse action was taken against him that would deter a person of ordinary firmness from engaging in that conduct; and (3) the adverse action was motivated, at least in part, by the protected conduct. *Thaddeus-X*, 175 F.3d at 394. Moreover, a plaintiff must be able to prove that the exercise of the protected right was a substantial or motivating factor in the defendant's alleged retaliatory conduct. *See Smith v. Campbell*, 250 F.3d 1032, 1037 (6th Cir. 2001) (citing *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)).

According to the United States Supreme Court in *Bell v. Wolfish,* 441 U.S. 520 (1979), the maintaining of institutional security and the preservation of internal order are essential goals that may require the limitation or retraction of a prisoner's constitutional rights. In the case *Pell v. Procunier,* 417 U.S. 817, 827 (1974), the Court found that prison security may be compromised by allowing inmates to become media news sources: "Extensive press attention to an inmate to espouse a practice of non-cooperation with prison regulations encouraged other inmates to follow suit, thus eroding the institution's ability to deal effectively with inmates generally." The Court also wrote that the "[i]nformed discretion of prison officials that there is potential danger may be sufficient to limiting rights even though this showing might be unimpressive if . . . submitted as justification for governmental restriction of personal communication among members of the general public." *Jones v. North Carolina Prisoner's Labor Union, Inc.,* 433 U.S. 119, 132-133 (1977). The Court also wrote that in the absence of substantial evidence in the record that prison officials have exaggerated their response to legitimate security concerns, courts should ordinarily defer to the expert judgment of prison officials. *Pell,* 417 U.S. at 827.

Plaintiff believes that he was retaliated against as the result of his contribution to an *Esquire* article detailing an earlier escape attempt made by him. This attempted escape was the

reason Plaintiff was initially placed in administrative segregation. Plaintiff orchestrated the escape attempt, fashioned everyday items into excavation implements, stole a 100 pound weight that was used to smash the concrete floor, and used a hacksaw blade to cut the rebar once the concrete had been removed. (Def. Ex. A, ¶¶ 10). Plaintiff claims that Defendants Straub, Sherry, and Bauman retaliated against him by a placing a RPA (Regional Prison Administrator) hold on him. The term "RPA hold" refers to the policy requirement that in certain instances a prisoner's release from administrative segregation requires special approval of the Regional Prison Administrator. Plaintiff claims that he would have been released from administrative segregation long ago were it not for the RPA hold. Plaintiff also had a "CFA hold" placed upon him. A CFA hold is placed on prisoners who pose a unique concern to the Michigan Department of Corrections. Plaintiff had a CFA hold placed upon him after his escape attempt, long before the publication of the *Esquire* article. Defendant Sherry was not the Regional Prison Administrator at the time of the hold, nor was Defendant Bauman the warden at that time. (Def. Ex. C, ¶¶ 5, Def. Ex. B, ¶¶ 4). Thus these Defendants were not responsible for the decision that Plaintiff remain in administrative segregation.

Plaintiff claims that due to the article in *Esquire,* Defendant Rutter failed to recommend his release from administrative segregation. According to his affidavit (Def. Ex. E), Defendant Rutter denies that there was any promise of release, only discussion that prisoners who displayed positive behavior would be reviewed closely. Defendant Rutter attests that inmates are routinely informed of their progress and are encouraged to improve their behavior, and that this was the case with Plaintiff, who was encouraged to follow all applicable MDOC rules and procedures. Defendant Rutter also states that he read the article in *Esquire*, that Plaintiff's initial assignment to administrative segregation occurred prior to the article, and that Plaintiff's continued confinement in administrative segregation had no relationship with the article. (Def. Ex. E, ¶¶ 5-7.)

In response to Defendant Rutter's affidavit, Plaintiff submits the Segregation Porter Request form that Defendant Rutter signed when he hired Plaintiff to work as a segregation unit porter on June 10, 2008. The form states that "Prisoners assigned as Segregation Unit Porters must not be long term Segregation prisoners, or have a history of Incite to Riot." (Plaintiff's Ex. E, Attachment 10.) Defendant Rutter told Plaintiff that he had earned prison officials' trust and that they believed that he could be managed in the general population. Defendant Rutter told Plaintiff that he was being given the porter job as part of a gradual re-introduction to the general population. Plaintiff asserts that when he asked Defendant Rutter to define "gradual" and "short term," Defendant Rutter replied, "Within 90 days. I'll approve your release by September." (Plaintiff's Ex. E, ¶ 13.) Therefore, there appears to be an issue of fact regarding Defendant Rutter's motivation for failing to recommend Plaintiff's release from administrative segregation.

Plaintiff claims that Defendant Kurth fired him from his job as a unit porter in retaliation for the *Esquire* article. However, Defendant Kurth attests that Plaintiff was fired for transporting contraband and making threats to other prisoners, not because of the article. (Def. Ex. F, ¶ 4). Specifically, Defendant Kurth states that the position of administrative segregation unit porter is heavily scrutinized because it requires the trust of staff. This position involves unique custody issues because segregation porters are allowed out of their cells unrestrained and unaccompanied by staff, which allows the porters to have access to numerous items that would come from outside the secure perimeter of the facility. (Def. Ex. F, ¶ 5.) Defendant Kurth attests:

> In August of 2008, I completed a shakedown of Hoffman's cell. During that shakedown, I found a prisoner "kite" addressed to another prisoner that discussed the illegal sale of tobacco. The kite also stated "someone owes me and I will get mine, however, blood or what."

9

(Def. Ex. F, ¶ 6.) Defendant Kurth states that the kite constituted a threat to good order and institutional security, and that it indicated that Plaintiff had been using his position as segregation porter for personal gain. Defendant Kurth asserts that this is the only reason for Plaintiff's termination from the porter position. (Def. Ex. F, ¶¶ 7-9.)

In response to Defendant Kurth's affidavit, Plaintiff attests that Defendant Kurth completed a notice of intent on Plaintiff on August 15, 2008, regarding items taken from Plaintiff's cell. The form required Defendant Kurth to list all of the items removed from Plaintiff's cell, but made no mention of any kite regarding the illegal sale of tobacco. (Plaintiff's Exhibit E, ¶ 49.) The only two items listed on the form were a dictionary with CD Rom, and an envelope with a phrase written on the back, "that makes specific mention to a serious threat to the safety and security of the institution, and most importantly the public." (Plaintiff's Exhibit E, Attachment 20.) Plaintiff claims that the phrase was a quote from page 97 of "The Tunnel" article and that Defendant Kurth's supervisor, J. Rankin, determined that it did not constitute a threat. The envelope and dictionary were subsequently returned to Plaintiff. (Plaintiff's Exhibit E, ¶ 49.) Therefore, there appears to be an issue of fact regarding Defendant Kurth's motivation for removing Plaintiff from his porter position.

Plaintiff claims that Defendant Contreras prohibited him from sending sealed media mail in retaliation for the *Esquire* article in violation of his First Amendment rights. Defendant Contreras attests that Plaintiff had what was initially classified as a media/prisoner relationship with the author of the article, Brian Mockenhaupt. This classification changed beginning on April 10, 2008, when Plaintiff listed Mockenhaupt as a "friend" on both the "Visiting Application," completed by Mockenhaupt, and a "Visitor List," completed by Plaintiff. Because prisoners may not send sealed mail to individuals determined to be friends, Plaintiff was no longer allowed to send sealed

10

media mail to Mockenhaupt. (Def. Ex. G, ¶¶ 4-6.) Defendants offer a copy of the Visiting Application and Visitor List in support of this assertion. (Def. Ex. G-1.) In response to this assertion, Plaintiff offers a copy of the Visitor List which instructs prisoners that "[a]ll individuals who do not meet the definition of immediate family member shall be listed as friend." (Plaintiff's Exhibit E, Attachment 7.) Consequently, there appears to be a genuine issue of material fact regarding the reason that Plaintiff was prevented from sending sealed media mail to Mockenhaupt.

As noted above, there appear to be factual issues regarding the motivation for Plaintiff's continued placement in administrative segregation, as well as the termination of his job assignment and his inability to send sealed media mail to Mockenhaupt. However, as noted above, the subject of Plaintiff's communications with the media was his escape attempt and set forth the details of this attempt. In *Spruytte v. Hoffner, et al.*, 181 F. Supp. 2d. 736 (W.D. Mich. 2001), the court concluded that the plaintiff, a state prisoner, was engaged in protected conduct when he wrote a letter to the editor of "The Daily Reporter." *Id.* at 742. In so finding, the court noted:

> Prisoners retain their First Amendment rights upon incarceration, although those rights may be curtailed in order to advance "the legitimate penological objectives of the corrections system," such as order, security, or rehabilitation. *Pell v. Procunier,* 417 U.S. 817, 822, 94 S.Ct. 2800, 2804, 41 L. Ed. 2d 495 (1974); *see also Bazzetta v. McGinnis,* 124 F.3d 774, 780 (6th Cir.1997). With regard to outgoing mail, courts have held that prisoners have the right to send letters to the media regarding prison matters, subject to reasonable prison regulations. *See Nolan v. Fitzpatrick,* 451 F.2d 545, 547-48 (1st Cir.1971); *Castle v. Clymer,* 15 F. Supp. 2d 640, 661 (E.D.Pa.1998). Furthermore, the Supreme Court has held that prison regulations affecting outgoing prisoner mail are subject to less deference than regulations on incoming prisoner mail because "the implications for security are far more predictable." *Thornburgh v. Abbott,* 490 U.S. 401, 412, 109 S.Ct. 1874, 1881, 104 L.Ed.2d 459 (1989).

*Id.* The court further stated:

> There is no dispute in this case that Spruytte's conduct in sending his letter to The Daily Reporter did not violate a legitimate prison regulation. *See Thaddeus-X,* 175 F.3d at 395 (stating that "if a prisoner violates a legitimate prison regulation, he is not engaged in 'protected conduct,' and cannot proceed beyond step one"). Nor did the contents of Spruytte's letter constitute a security risk. *See Thornburgh,* 490 U.S. at 412, 109 S.Ct. at 1881 (stating that outgoing prisoner mail that creates a security risk generally falls within the categories of "escape plans, plans relating to ongoing criminal activity, and threats of blackmail or extortion"). In addition, the contents of the letter, which involved prison conditions and presented the other side of an issue presented in the newspaper, were a matter of concern to the public. *See Nolan,* 451 F.2d. at 547-48 ("The argument that the prisoner has the right to communicate his grievances to the press and, through the press, to the public is thus buttressed by the invisibility of prisons to the press and the public: the prisoners' right to speak out is enhanced by the right of the public to hear").

*Id.*

In contrast to *Spruytte*, the subject of Plaintiff's communications to the press in this case was his attempted escape and the details of that attempt. Therefore, Plaintiff's communications fell "within the categories of 'escape plans, plans relating to ongoing criminal activity, and threats of blackmail or extortion'" and created a security risk. *Spruytte*, at 742. In fact, the issue of *Esquire* which contained the article at issue was banned from the prison because it was found to be a threat to the order and security of the institution. (Defendants' Exhibit D, p. 1.) Consequently, Plaintiff's communications with Brian Mockenhaupt did not constitute protected conduct for purposes of a retaliation claim. Because Plaintiff did not have a protected right to communicate details of his escape attempt to the media, his retaliation claims against Defendants Contreras, Rutter and Kurth must fail.

Defendants assert that they are entitled to summary judgment on Plaintiff's official capacity claims against them because such claims are barred by the Eleventh Amendment. Any

claims against the individually-named Defendants in their official capacities do not state a claim upon which relief can be granted. *See Will v. Michigan Department of State Police*, 491 U.S. 58 (1989) (claims against a state agency or an official in his/her official capacity are claims against the state, and are not claims against a "person" subject to Section 1983 liability); *Frederick v. Abramajtys*, No. 94-1935, 1995 WL 564321, **1 (6th Cir. Sept. 21, 1995) (unpublished). Moreover, the Eleventh Amendment bars suit against the State or one of its agencies in federal court unless the state has given express consent, regardless of the relief sought. *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 100 (1984), overruled in part on other grounds, *Will*, 491 U.S. 58; *Alabama v. Pugh*, 438 U.S. 781, 782 (1978) (State and Board of Corrections).[1] The State of Michigan has not consented to civil rights suits in the federal courts. *See Abick v. Michigan*, 803 F.2d 874, 877 (6th Cir. 1986). The Eleventh Amendment therefore bars official-capacity suits for damages against its employees. Therefore, any official capacity claims are properly dismissed.

Defendants also claim Plaintiff's individual capacity claims are barred by qualified immunity because Plaintiff has failed to show a violation of clearly established law. Government officials, performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Dietrich v. Burrows*, 167 F.3d 1007, 1012 (6th Cir. 1999); *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997); *Noble v. Schmitt*, 87 F.3d 157, 160 (6th Cir. 1996); *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). An "objective reasonableness" test is used to determine whether the official could reasonably have believed his conduct was lawful. *Dietrich*,

---

[1] The Sixth Circuit has held that since an official capacity suit for retroactive relief, such as monetary damages, is deemed to be against the State, whose officers are the nominal Defendants, the claim is barred by the Eleventh Amendment. *Doe v. Wigginton*, 21 F.3d 733, 736-737 (6th Cir. 1994).

167 F.3d at 1012; *Anderson v. Creighton*, 483 U.S. 635, 641 (1987). "Qualified immunity balances two important interests-the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 129 S. Ct. 808, 815 (2009).

In making a qualified immunity determination the court must decide whether the facts as alleged or shown make out a constitutional violation or whether the right that was allegedly violated was a clearly established right at the time of the alleged misconduct. *Id.* at 816. If the court can conclude that either no constitutional violation occurred or that the right was not clearly established, qualified immunity is warranted. The court may consider either approach without regard to sequence. *Id*. As noted above, Defendants did not violate Plaintiff's constitutional rights. Therefore, they are entitled to qualified immunity.

In conclusion, as noted above, Defendants Straub, Sherry, and Bauman are entitled to summary judgment because Plaintiff failed to exhaust his administrative remedies. In addition, Plaintiff fails to allege any facts showing the requisite personal involvement by Defendants Straub, Sherry, and Bauman. The court further concludes that Defendants Contreras, Rutter, and Kurth are entitled to summary judgment on the merits of Plaintiff's claims because the record fails to show any issue of material fact regarding whether they violated Plaintiff's constitutional rights. Accordingly, I recommend that the motion for summary judgment (docket #18) be granted and this case be dismissed in its entirety.

Should the court adopt the report and recommendation in this case, the court must next decide whether an appeal of this action would be in good faith within the meaning of 28 U.S.C. § 1915(a)(3). *See McGore v. Wrigglesworth*, 114 F.3d 601, 611 (6th Cir. 1997). For the same reasons that the undersigned recommends granting Defendants' motion for summary judgment, the

undersigned discerns no good-faith basis for an appeal. Should the court adopt the report and recommendation and should Plaintiff appeal this decision, the court will assess the $455 appellate filing fee pursuant to § 1915(b)(1), *see McGore*, 114 F.3d at 610-11, unless Plaintiff is barred from proceeding *in forma pauperis*, e.g., by the "three-strikes" rule of § 1915(g). If he is barred, he will be required to pay the $455 appellate filing fee in one lump sum.

NOTICE TO PARTIES: Objections to this Report and Recommendation must be served on opposing parties and filed with the Clerk of the Court within fourteen (14) days of receipt of this Report and Recommendation. 28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b); W.D. Mich. LCivR 72.3(b). Failure to file timely objections constitutes a waiver of any further right to appeal. *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). *See also Thomas v. Arn*, 474 U.S. 140 (1985).

/s/ Timothy P. Greeley
TIMOTHY P. GREELEY
UNITED STATES MAGISTRATE JUDGE

Dated: August 24, 2011